Filed 5/19/16  P. v. Vasquez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT VASQUEZ,<br><br>        Defendant and Appellant. | C075490<br><br>(Super. Ct. No. 10F06355) |

After a brief cat-and-mouse game between two vehicles, shots were fired, leaving one of the drivers dead.  Defendant Robert Vasquez was charged with murder with special circumstances.  The jury found defendant guilty.  Sentenced to life in prison without possibility of parole, defendant appeals.  He argues (1) the court violated his right to a fair and impartial jury by failing to inquire as to whether the jurors had been exposed to media coverage, (2) the court improperly admitted gang evidence, (3) the court committed instructional error, and (4) his counsel was ineffective in failing to request an instruction informing the jury that provocation may reduce murder from first to second degree.  We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In September 2012 an information charged defendant with the special circumstances murder of Madalene Thomas and alleged defendant intentionally and personally discharged a firearm, causing great bodily injury or death.  (Pen. Code,

1

§§ 187, subd. (a), 190.2, subd. (a)(21), 12022.53, subd. (d).) The following evidence was presented at the ensuing jury trial.

**The Shooting**

On a Saturday evening, 18-year-old Taylor Lee and his aunt, Madalene Thomas, visited a relative in Rancho Cordova. After midnight the pair left and drove in Thomas's white Volvo toward home. As they left, Thomas told Lee to knock on the taillights of her Volvo so that the malfunctioning lights would come back on. One of the taillights was out, and when Lee hit the taillight it came back on.

As the pair drove, Lee noticed an older model black Honda was tailgating the Volvo. The Honda then speeded up and passed the Volvo, swerving in front of the Volvo and almost cutting off the car. The Honda drove up the street ahead of the Volvo and stopped.

Lee and Thomas thought it might be someone they knew, since it was their experience that people who tailgate usually know the person they are following. Thomas slowed down so they could see the other driver. She drove slowly past the Honda. As they looked to see if they knew him, the driver of the other car got out and stood beside the Honda, watching them. The male driver yelled something like, "[W]hat's up, homie?" He then pulled out a gun and Lee ducked. Lee heard a gunshot, which left his ears ringing and glass shattered all around. Lee told Thomas to drive. Thomas drove and Lee told her he had not been hit.

After driving a short distance, Thomas slumped over, her foot stuck on the accelerator. Lee grabbed the steering wheel as the car went out of control and crashed into a tree. Lee ran to a bar to get help; however, no one would call the police. Lee returned to the Volvo and called his mother and then the police. A neighbor who had heard the gunshot offered to help. Lee told him Thomas had been shot and they both got Thomas out of the car. They took off Thomas's shirt and attempted to stanch the flow of

2

blood from the bullet hole.  The bullet entered Thomas's right side near her armpit and lodged in her neck.

Although the shooter looked familiar to Lee, he could not place him.  However, Lee later realized the man lived in his aunt's neighborhood.  He identified defendant in court as the man who shot his aunt.  Lee had never spoken with defendant before the shooting.

**Detective Turnbull's Testimony**

Detective Tony Turnbull responded to the police call.  He found Thomas and the Volvo about 1.2 miles from the scene of the shooting.  The Volvo's front passenger window was shot out.  After being hit, Thomas drove for a distance before crossing into oncoming traffic, through a parking lot, and then crashing into a tree.

**Subsequent Events**

Three days after the shooting, detectives located defendant in Redwood City.  When detectives knocked on defendant's hotel room door, he asked, "[W]ho is it?"  A detective identified himself and defendant asked who they were looking for, opening the door slightly.  Detective Riali said, "Robert, let me see your hands."  Defendant shut and locked the door.

As the detectives began kicking in the door, defendant jumped out of the room's third-story window and was apprehended by officers.  Officers found the gun, later identified as the murder weapon, in defendant's hotel room.  Defendant was treated at a local hospital, and officers arrested him.  An examination of defendant's Honda revealed gunshot residue.

**Defense Case**

*Defendant's Testimony*

<u>**Background.**</u>  Defendant testified in his own defense.  Twenty-five years old at trial, he grew up in Los Angeles and moved to Northern California when he was 14 years old.  Prior to the shooting he lived in Rancho Cordova with his girlfriend Alicia Garcia,

their two-year-old daughter, and Alicia's family. A fan of the Los Angeles Lakers and Dodgers, defendant wore the color blue.

A few months before the shooting, defendant began to feel unwelcome in his neighborhood because he dressed as if he were from Los Angeles and wore the color blue. People gave him looks and told him to go back where he belonged. Defendant was threatened and followed. Once a car pulled into a nearby driveway, cutting defendant off from walking on the sidewalk, and the driver stared at him.

On three to five occasions, a white car followed defendant as he traveled to and from work in his Honda or another car. Defendant feared for his life and believed the driver of the white car wanted to kill him. In an effort to misdirect the person following him, defendant would not drive straight home after work.

A few weeks prior to the shooting, someone in a white car shot at defendant. The incident occurred while he was at a gas station. Defendant attempted to drive away and lose the white car, but it followed him. When defendant returned home, the white car was there and someone fired more shots at defendant before speeding away.

About two weeks before that shooting, defendant left another gas station and was followed by what looked like the same white car. The car pulled up to defendant's car while he was stopped at a light and shot three or four times but missed the car. Afraid to return straight home, defendant drove around. He called his mother and told her about both shootings.

Defendant was threatened several times over the phone while at his friend Fred Barron's house. The caller would tell Barron to tell him where defendant was and that he knew where the "scrap" was.[1] The caller was going to "green light," or shoot, defendant. The caller threatened to kill Barron and his family, and to shoot at Barron's house if

---

[1] "Scrap" is a derogatory term used by Norteño gang members for Sureño gang members and refers to someone from Los Angeles.

Barron did not tell him where defendant was. The caller said defendant would be dealt with and that Barron should not be around defendant or he would be dealt with. According to the caller, defendant's days were numbered.[2]

Defendant was frightened. He got a gun for protection about two weeks before the shooting from a person he met at a grocery store. He kept the gun in his car.

**The Shooting.** On the day of the murder, defendant got off work late in the evening. He and Philip Garcia, Jr. (Philip), went to a friend's house to pick up some tools. They dropped off the tools at Barron's house. Defendant met Barron outside the house to return the tools.

As defendant walked back to his Honda, he noticed a white car driving down the street with flickering lights. The car passed him. Defendant panicked, got into his car, and began following the white car. He believed it was the same car that had been following him and shooting at him. Defendant followed the car for several blocks. Although defendant was frightened, he wanted to see who was driving the white car so he could stop the shooting and the threats. Defendant was weary of living in fear. This time was different because he had a gun, although he did not want anything to happen. The gun was for protection.

At one of the stop signs, defendant passed the white car on the left and then swerved in front of the car. Defendant thought he saw two males in the white car. The white car pulled up very close to defendant's car, preventing him from opening the door. As the white car pulled up, defendant saw the passenger throw up his hands and sit back. The driver of the white car reached over the passenger and pointed a gun at defendant.

---

[2] Barron testified that he received multiple anonymous phone calls asking for defendant's whereabouts and threatening Barron's family. The caller referred to defendant as a "scrap."

5

Defendant picked up his gun and shot at the white car because he was trapped. The driver's side window of defendant's car was broken and did not roll down, so defendant opened his door as far as he could and fired the gun. Defendant then drove away. Defendant felt hurt when he later learned he had shot a woman who was a relative of one of his neighbors.

**Gang Evidence.** Defendant has the number 13 tattooed on his stomach. Thirteen is defendant's lucky number. Prior to his incarceration, defendant knew nothing about street gangs. He did not know "scrap" refers to a Sureño gang member. Although the people that defendant was having problems with in his neighborhood usually wore red, defendant did not think they were Norteño gang members.

Defendant sometimes wore blue but never represented himself as a gang member. He did not think people were referring to him as a gang member. Barron did not tell defendant anything about gangs or the color red.

Defendant showed the jury his number 13 tattoo and the three dots tattooed on his hand. Although defendant testified these tattoos can represent gang affiliations, he stated in his case they did not. Defendant knew some people in his neighborhood did not like him wearing blue, but he kept on wearing it.

*Philip Garcia, Sr.'s, Testimony*

Philip Garcia, Sr. (Garcia), stepfather of defendant's girlfriend Alicia, testified. A month or two prior to Thomas's murder, a shooting took place in front of Garcia's house. Garcia was in his garage when he heard five or six gunshots. Garcia looked out of the garage and saw a light-colored car backing down the street. When defendant came home he told Garcia people were shooting at him.

Garcia considered defendant family. He told defendant not to wear blue because defendant would be identified with Sureño gang members. Garcia did not believe defendant had to wear red, the color favored by Norteño gang members. People in the neighborhood who wore red gave defendant hard looks.

6

After Garcia gave defendant this advice, defendant stopped wearing blue as much and things improved. However, defendant began having problems with a black man who moved in across the street. Defendant knew blue was gang related and knew what gang members were. A few months before the murder, when defendant was in front of Garcia's house, a group of youths came down the street and shot at defendant. Defendant also told Garcia that he was threatened by gang members at a market.

### *Philip Garcia, Jr.'s, Testimony*

Garcia's son Philip testified he was waiting in defendant's car when defendant returned tools to Barron. Defendant returned to the car in a panic and described a car "acting kind of funny with their headlights." Defendant drove quickly to catch up to the white car, and for a few minutes the two cars drove slowly side by side. Then defendant drove in the bike lane alongside the car. Philip could not see who was in the car, but it looked like someone's hands were going up in the air.

Defendant pulled out a gun and fired a shot. He might have said, "[W]hat's up, what's up, homie?" while shooting. The white car kept going, and defendant returned to the Garcia home. Defendant's family later threatened Philip; they wanted to "take [Philip] out" so that defendant did not "go down alone."

Philip had known defendant for two or three years before the murder. Philip was a good friend of Lee, who cut Philip's hair and who had attended high school with him. Philip also knew Thomas well.

### *Theresa Vasquez's Testimony*

Defendant's mother, Theresa Vasquez, testified. Several times a week for a couple of months, defendant would call Theresa when he was upset. Defendant told his mother he was being followed and cars were trying to drive him off the road. He also called his mother after someone tried to shoot him.

7

Theresa did not give this information to officers when she was first interviewed because no one asked her. Defendant's mother was first interviewed about three years after the murder.

### *Dr. Jason Roof's Testimony*

Dr. Jason Roof, a medical doctor, testified. The defense asked Dr. Roof to evaluate defendant and review defendant's medical records. Specifically, the doctor was to evaluate defendant's injuries resulting from his fall from the third-story window during his arrest. Defendant suffered a very severe injury to his skull and brain, broken bones, and a punctured lung. According to Dr. Roof, these injuries could impact defendant's ability to recall and communicate about past events.

## Rebuttal

### *Detective Lizardo Guzman's Testimony*

Detective Lizardo Guzman testified as an expert on gangs. According to Guzman, Norteños are an Hispanic gang from Northern California whose members typically wear the color red and claim the letter N, which is the 14th letter of the alphabet. In contrast, Sureños are a southern Hispanic gang usually from south of Bakersfield whose members wear the color blue and claim the letter M, the 13th letter of the alphabet. The Mexican Mafia, a prison gang, controls the Sureños. The Sureños and Norteños are rivals.

Gang members wear their colors so they can identify themselves to other gang members and intimidate rival gang members. They gain respect by wearing their colors. Many Sureños show their gang allegiance via tattoos. Three dots on the hand stands for the number three, and sometimes a gang member will tattoo one dot on the other hand; together, the dots signify 13. The number 13 shows respect and homage to the Mexican Mafia.

According to Guzman, the three dots on defendant's left hand are a common Sureño marking, as is the number 13 tattooed across his chest. These tattoos demonstrate fidelity to the Mexican Mafia. Guzman stated that, in his opinion, based on the two

8

tattoos and defendant's frequent sporting of the color blue, defendant was a member of the Sureños.  Wearing blue in a Norteño neighborhood is a sign of disrespect against the Norteños.  A "scrap" is an offensive term that Norteños use for Sureño gang members.  Guzman testified that the wearing of gang colors in enemy territory is a gang member's way of identifying with his gang and showing disrespect to the rival gang.

**Verdict and Sentence**

The jury found defendant guilty of murder and found true the special allegations.  The court sentenced defendant to life in prison without the possibility of parole for Thomas's murder, plus a consecutive term of 25 years to life for the firearm enhancement.  Defendant filed a timely notice of appeal.

## DISCUSSION

### Voir Dire

Defendant argues the trial court erred in failing to inquire, during voir dire, into whether jurors had been prejudicially exposed to media coverage in violation of his constitutional rights to a fair trial and due process.  Defendant points out that one of the prospective jurors indicated he was aware of news reports about the case.

**Background**

During voir dire of all prospective jurors, the trial court asked if any of them had knowledge of the case, whether from the news or by any other source.  The trial court stated:  "I'm going to tell you a little bit about the case.  And this is very little.  It's not evidence.  I'm just going to give you a framework in case you've heard something about it, whether it be on the news or anything else, we're going to want to know about that."

After the court provided a brief outline of the case, it informed the jury:  "For those of you who are out in the audience, I mentioned briefly earlier I'm going to be asking questions primarily of the people up here in front, but if you could listen, follow along, I'm going to be asking you the very same questions.  I will want to know from everyone if you know anything about the case, and if so, what you may remember about

9

it." The court also asked the entire jury pool: "And also, I want to know about the -- if you're particularly familiar with the Rancho Cordova area or familiar with the charges. Okay?"

Prospective Juror 1 indicated he had heard about the case. He stated he had known the victim as a family friend who had passed away. The court asked whether Prospective Juror 1 had any information about what had happened; he replied, "No. I just heard it on the news and from my brother."

The court then asked the jury panel if anyone recognized the name of the victim. In addition, the court asked each juror separately whether there was anything about the case that would cause concern about sitting on the jury or prevent the juror from being fair and impartial. The court excused Prospective Juror 1.

**Discussion**

Defendant contends that since there was media interest in the case and at least one prospective juror had heard at least one news report concerning the case, "it is all but certain that some other prospective jurors or selected jurors had likewise been exposed to media reports. Yet even though the trial court advised the panel that if they had heard something 'on the news or anything else, we're going to want to know about that,' no inquiry was made by any participant in the trial about media coverage." This dearth of inquiry failed to ensure defendant a fair trial.[3]

The trial court enjoys considerable discretion in conducting voir dire, since it is in the best position to assess the amount of voir dire required to ferret out latent prejudice and judge potential juror responses. We find an abuse of discretion only where the trial court's questioning is not reasonably sufficient to test the jury for bias or partiality.

---

[3] The People contend defendant has forfeited the issue by failing to object in the trial court. However, defendant also claims counsel performed ineffectively in failing to object to the trial court's conduct of voir dire. Therefore we shall address the issue.

10

(*People v. Taylor* (2010) 48 Cal.4th 574, 608; *People v. Box* (2000) 23 Cal.4th 1153, 1179, overruled on other grounds in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; *People v. Ramos* (1997) 15 Cal.4th 1133, 1157-1158.) "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal." (*People v. Holt* (1997) 15 Cal.4th 619, 661 (*Holt*).)

Defendant points to standard 4:30(b)(9) of the California Standards of Judicial Administration (Standards), which provides the model question: "Have any of you heard of, or have you any prior knowledge of, the facts or events in this case?" The Supreme Court has instructed trial courts to use the Standards during voir dire: "Failure to use the recommended language may be a factor to be considered in determining whether a voir dire was adequate, but the entire voir dire must be considered in making that judgment." (*Holt*, *supra*, 15 Cal.4th at p. 661.)

Defendant faults the court in the present case for not specifically questioning the jurors about media exposure, arguing we cannot conclude the jury was free from bias from media exposure. We disagree.

The court, in addition to informing the potential jurors that if they had heard something "on the news or anything else, we're going to want to know about that," also asked the potential jurors if they knew anything about the case and, if so, what they remembered about it. Later, the court reiterated its desire to know if the jurors were familiar with the charges or the area in which the alleged crime took place. Once the court discovered a potential juror was acquainted with the victim. In addition, the court questioned each juror separately as to whether there was anything that would prevent the juror from being fair and impartial.

Although the court did not use standard 4.30(b)(9) of the Standards verbatim, the court's questioning clearly urged the jurors to report any prior knowledge of the case from any source, including the news. A fair trial does not require strict adherence to the

11

recommended Standards. (*Holt*, *supra*, 15 Cal.4th at p. 661.) Here, the trial court admonished the jury appropriately, excused a potentially biased juror, and afforded both the prosecution and defense counsel the opportunity to question the jurors further. The court's actions did not deprive defendant of a fair and impartial jury.

## Admission of Gang Affiliation Evidence

Defendant contends the trial court abused its discretion in admitting gang affiliation evidence, including defendant's large tattoo of the number 13 on his chest. The admission of this evidence, defendant argues, violated his due process rights.

## Background

During defendant's cross-examination, the prosecutor made a motion to cross-examine defendant about his gang knowledge and gang affiliation. The prosecutor told the court he had just discovered that defendant had a very large 13 tattooed on his chest and that defendant wore blue. Based on his experience, the prosecutor was aware that the number 13 represents the Sureños and the letter M represents the Mexican Mafia.

The prosecutor also recounted defendant's testimony that he wore blue because he was a Dodgers fan and did not know why people in the neighborhood who wore red would shoot at him. In addition, defendant's definition of the term "scrap" was inaccurate and misleading.

According to the prosecutor, the gang evidence he sought to admit was relevant to explain why defendant was a target in his neighborhood, why he failed to call the police when he was shot at, and defendant's motive for shooting Thomas. However, defense counsel argued that although the evidence might be marginally relevant, the prejudicial impact of gang evidence outweighed any probative value it might have. Defense counsel noted that there was no evidence anyone knew of defendant's tattoo or of his involvement with the Sureños.

After considering counsel's comments, the trial court found defendant had testified that he occasionally wore Dodgers clothes because he was a fan and that

12

someone called him a "scrap and that those are fighting words." The court stated: "[T]hose things have given the jury the impression that he's just some poor guy in the neighborhood and can't understand why people are not welcoming him into the neighborhood, and that now with the understanding that he is, in fact, a rival gang member in the neighborhood puts kind of a different light on this.

"Whether or not that changes an imperfect self-defense is something different, because he's testified now that he thought the driver of this car pointed a gun at him.

"There's no indication that the driver of the car is in any way related to a gang, but it certainly does go to his motive and retribution, if he has been shot at, which he has testified to on two separate occasions, the gang information gives the jury a different impression and an understanding of why this poor guy just in Rancho Cordova wearing his Dodger colors, you know, fan favorite, is being shot at in Rancho Cordova.

"We've left the jury with a very poor understanding of what's actually going on. It just doesn't give them the true picture and the truth, and that's a problem.

"Now, to what degree we go into gang evidence now is a whole another [*sic*] issue.

"The fact that the defendant has a tattoo certainly makes him -- gives an indication -- let me just say this -- that he has a much greater understanding of what being a Sure[ñ]o is all about or being a southerner. He did mention a southerner in his testimony.

"A tattoo is a marker. It's just ingrained more than just somebody who has a passing knowledge of what wearing Dodger blue in a red neighborhood is all about, but how much to go into it is really the issue.

"It is relevant. There's no question that it's relevant. It's relevant to his motive and retribution. It's relevant to why he would not call the police. It's relevant to why he has this ongoing beef with these people.

13

"All of those reasons that [the prosecutor] just mentioned, I agree, the Court agrees that it is relevant, but how much to go into it.

"I think it's certainly fair cross-examination to ask the defendant about his knowledge and gang membership, because to leave an impression otherwise that he just has no idea why these people wouldn't like him is just not fair to the jury."

The court limited defendant's cross-examination to whether defendant was a gang member, identifying the Sureño gang and explaining the relationship between the Sureños and the Norteños. In addition, the court cautioned against the cross-examination straying too far into gang testimony. The court discussed its discretion under Evidence Code section 352, finding "in that limited fashion, just as it relates to this case, not going off into other areas of gang crimes, and there's no gang allegations attached to this, not going off into other gang crimes and other expert opinion, I think it's -- the probative value does outweigh any prejudicial effect."

The prosecutor stated he would seek to admit expert testimony if defendant denied knowledge of and involvement with gangs. Later, when the prosecutor sought to admit such testimony, defense counsel objected. The expert would testify to explain the two rival Hispanic gangs, the significance of the numbers 13 and 14, the significance of particular tattoos, and the desire for respect among gang members.

The trial court found: "[T]he problem with all this is that the defendant has now testified that 13 is his lucky number, and it was on there since he played baseball, and the three dots don't mean anything, and the blue clothes have nothing to do with anything other than the fact that he's a Dodger fan and that other people don't buy his clothes.

"Whether or not the jury -- what [defense counsel] mentioned is the jury is not ignorant. I'm not suggesting that the jury is ignorant, but I don't know that these people who sit here have any knowledge of what seems to be second nature to the attorneys and even some of the witnesses about red and blue, and as I've instructed them, the jury's --

14

the attorneys' questions are not evidence, and just because they insinuate something doesn't make it so.

"So without a gang expert or somebody telling them that 13 is associated with the Southern California gang and 14 is -- well, we don't have any evidence of 14, but it's separate from Northern California.

"They have -- they really have no idea. There's been a lot of questions asked, but no one's really explained to them that 13 is significant and three dots is significant and the colors are significant. Without someone telling them that, they just have no idea.

"Now, whether or not it's relevant to this case, it's certainly relevant, I think, at this point to the defendant's credibility given the way he's testified thus far, but I do agree that it should be somewhat in a limited fashion.

"As far as the history of gangs, I'm not sure that that's really necessary for our purposes here.

"A gang expert can testify that there is a separation, north and south, Norte[ñ]os, Sure[ñ]os, they identify in certain manners . . . meaning color and tattoos or numbers, and that they are rival, and they are motivated, which is not to suggest, and the expert should not suggest, that this particular defendant, because as far as I'm aware, no one has validated the defendant, or there's been no evidence that he has been validated as a gang member or that he's engaged in gang activity, and then we would be getting into something that is quite a bit more prejudicial, I agree, but the fact that these persons who are wearing red are offended by somebody who's wearing blue, the jury has to understand that, and I don't think that that's as common knowledge as we might think in the courtroom. There might be some people that understand that, but I don't know. I don't know that, as far as of the complexion of the jury, whether that's something that they understand or not."

Ultimately the court allowed the gang expert to testify in general terms about the Norteños and Sureños, the colors they sport, the numbers they claim, and the fact they are

15

rivals. The expert could also explain that persons wearing red would be offended by persons wearing blue in their neighborhood; it would be considered disrespectful. In addition, the expert could define the word "scrap." But the expert could not opine that defendant was motivated by a desire to avenge his gang, since there was no evidence defendant was involved in gang activity.

The court instructed the jury with CALCRIM No. 1403, which states: "You may consider evidence of gang activity only for the limited purpose of deciding whether:

"• The defendant had a motive to commit the crime charged;

"or

"• The defendant actually believed in the need to defend himself.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

**Discussion**

Under Evidence Code section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Relevant evidence includes evidence having any tendency to prove or disprove any disputed fact that is of consequence to the determination of the case. (Evid. Code, § 210.)

Gang evidence, inflammatory in nature, tends to allow the jury to improperly infer that the defendant is criminally disposed and guilty of the charged offense. (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) In cases that do not include a gang enhancement, such potentially prejudicial evidence should not be admitted if it possesses minimal probative value or is only tangentially relevant. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *People v. Tuilaepa* (1992) 4 Cal.4th 569, 588.)

16

Gang evidence is admissible if otherwise relevant, but it must be carefully scrutinized prior to its admission. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Perez* (1981) 114 Cal.App.3d 470, 477-478.) Such evidence may be relevant and admissible in connection with identity, motive, modus operandi, specific intent, or other issues pertinent to guilt. (*Hernandez, supra*, 33 Cal.4th at p. 1049.) We review the trial court's admission of such evidence for an abuse of discretion. (*People v. Harrison* (2005) 35 Cal.4th 208, 230.)

A gang expert may testify regarding the culture, habits, and psychology of gangs since these subjects are sufficiently beyond the jury's common experience and expert opinion assists the jury in evaluating the evidence. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) An expert may testify about the makeup of a gang, the motivation for a particular crime, and whether a crime was committed to benefit or promote the gang. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-658.)

Defendant characterizes the evidence of his gang affiliation as minimal: "[T]here was no evidence presented that [defendant] had been active in the Sure[ñ]os or that he had ever committed any crimes, let alone on behalf of the Sure[ñ]os. To the contrary, other than wearing the color blue and having tattoos, there is a dearth of evidence [defendant] engaged in any conduct that was even arguably associated with a gang." The gang evidence, defendant argues, was highly prejudicial and inflammatory, allowing the jury to convict defendant regardless of the issues and facts presented.

Defendant himself made the gang evidence pertinent in the present case. Initially, defendant testified he wore the color blue because he was a Los Angeles Dodgers fan, which resulted in his being harassed, threatened, and shot at. People called defendant a scrap, which he defined as someone from Los Angeles. Frightened for his life, defendant got a gun for protection.

Prior to cross-examination, the prosecution discovered defendant had a large tattoo of the number 13 on his stomach and three dots on his hand. These tattoos, along with

17

wearing the color blue, are common to Sureño gang members. The trial court determined these factors would help the jury understand why defendant's presence in the neighborhood aroused ire. In addition, the evidence was relevant to show motive, to explain why defendant would shoot at a car he believed was following him.

During cross-examination, defendant asserted the 13 tattoo represented his lucky number. Defendant denied knowing anything about Sureños, Norteños, or gang members. He did not believe the people threatening him were Norteños and denied ever representing himself as a gang member. Barron, his friend, never told him about gangs, the significance of the color red, or what the word "scrap" meant.

The prosecution, on rebuttal, was allowed to call a gang expert to testify about the basics of the Norteños and Sureños. Detective Guzman discussed only what the trial court found admissible: the colors and numbers that are significant to each side, their rivalries based on those colors and numbers, the definition of the term scrap, and the gangs' reactions to individuals sporting rival colors.

This evidence was extremely probative to explain the atmosphere surrounding defendant, and the threats and animosity that led him to arm himself. It also provided a motive for killing Thomas. No evidence linked Thomas or Lee to any gang activity, but defendant believed the occupants of the white car were the people threatening to kill him. Defendant's wearing of gang colors and his sporting gang tattoos led to rival gang members' threats and defendant's firing at the car.

Nor do we find the gang evidence unduly prejudicial. Under Evidence Code section 352, prejudice means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt. (*People v. Crew* (2003) 31 Cal.4th 822, 842.) Defendant argues the jury would have speculated that he was a "deeply involved, hard-core gang member" and would have convicted him regardless of the facts presented. However, the trial court explicitly prohibited any testimony stating defendant was a gang member or involved in any gang

18

activity. Detective Guzman's testimony was couched in generalities; he did not testify that defendant shot Thomas out of revenge or that defendant was involved in any other gang activity. Given the trial court's careful crafting of the limits of Guzman's testimony, we cannot find the trial court acted in an arbitrary, capricious, or absurd manner.

**INSTRUCTIONAL ERROR**

**Imperfect Self-defense**

Defendant faults the trial court's instruction on imperfect self-defense as being overbroad and not supported by the evidence. Defendant challenges portions of CALJIC No. 5.17, CALCRIM No. 3471, and CALJIC No. 5.55.

The court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and that are necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) However, the court is under no duty to instruct on points of law not relied on by the parties. Before giving the instruction, the court must find legally sufficient evidence in the record to support the finding or inference that the instruction permits. (*People v. Hannon* (1977) 19 Cal. 3d 588, 597-598.) We consider the instructions as a whole to determine whether they correctly state the law. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237.)

We assess de novo whether the instructions correctly state the law and whether the instructions effectively direct a finding adverse to the defendant by removing an issue from the jury's consideration. In reviewing the instructions, we assume the jurors are intelligent persons, capable of understanding and correlating the given instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

19

**CALJIC No. 5.17**

During trial, defendant filed an objection to several proposed jury instructions, including CALJIC No. 5.17. Defendant argued the instruction lacked evidentiary support and was overbroad.

The court instructed the jury with CALJIC No. 5.17: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury (imperfect self-defense), kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

"As used in this instruction, an 'imminent' danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

"However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force or pursuit."

Defense counsel argued the instruction addresses fights or physical altercations and therefore would be misleading if given. Defendant renews this contention on appeal and argues the words "wrongful conduct" in the final paragraph are overbroad.

In *In re Christian S.* (1994) 7 Cal.4th 768, the Supreme Court set forth the rationale that led to CALJIC No. 5.17: "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's . . . pursuit is legally justified. . . . It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such

20

circumstances. . . ." (*Christian S.*, at p. 773, fn. 1.)  In *People v. Enraca* (2012) 53 Cal.4th 735, 761, the Supreme Court found the trial court properly instructed with CALJIC No. 5.17 and pointed out as examples of wrongful conduct the initiation of a physical attack or the commission of a felony.

Neither case limits the wrongful or unlawful conduct described in CALJIC No. 5.17 to a physical altercation, nor does the instruction itself set forth such a limitation.  Here, defendant raced up behind Thomas's car and began tailgating the vehicle.  Defendant swerved to the left, rapidly passing the other vehicle.  As Thomas passed him, defendant yelled out, "[W]hat's up, homie?" and drew a gun.  In developing instructions, the court was not compelled to accept defendant's assertion that his conduct was not provocative but at most a traffic violation and entirely nonthreatening.  These facts, taken together, support the trial court's instruction pursuant to CALJIC No. 5.17 that defendant engaged in wrongful or unlawful conduct that would justify the use of force, attack, or pursuit by Thomas.

**CALCRIM No. 3471**

Defendant also objected to the prosecution's request that CALCRIM No. 3471 be modified with the removal of the words "fight" and "fighting" from the instruction. According to defendant, the instruction only applies to a fight or physical confrontation, and the requested modification would deprive him of the ability to present an imperfect self-defense defense.  During the discussion of jury instructions, defendant asked that the instruction be modified to indicate it applied to self-defense as well as imperfect self-defense and objected to the additional language regarding an initial aggressor.

The court instructed the jury with CALCRIM No. 3471 as follows:  "A person who starts a fight has a right to self-defense or imperfect self-defense only if:

"1.  He actually and in good faith tried to stop fighting;

"and

21

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.

"If the defendant meets these requirements, he then had a right to self-defense or imperfect self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent."

Defendant argues there is nothing from which any rational juror could conclude there was any form of fight or that defendant started a fight. In finding the instruction applicable, the trial court found: "Given the state of the evidence that the defendant, if believed, it's just evidence that's been presented, but that the defendant may have cut off the victim's car, it does appear that he could be considered an initial aggressor." On appeal, defendant contends the court's finding that he could be considered an initial aggressor is not supported by the record.

The evidence supports the trial court's finding. Defendant testified that after he dropped off the tools at Barron's house, he saw a white car drive by with its front lights flickering. Defendant got into his car and followed the white car, which he believed was the car that had previously followed him and whose occupants had shot at him. He testified that he "wanted to know who it was and how to solve it, how to end it all," and wanted to catch the car because he was tired of living in fear. However, this time it was different because defendant had a gun. Defendant followed the white car, passing it and swerving from side to side. He thought he saw two males in the car, pulled out his gun, and fired.

Thomas's nephew, Lee, testified that defendant's car swerved in front of their car and then stopped. Defendant opened the door, stepped out, and watched as Thomas

22

drove by. After defendant yelled, "[W]hat's up, homie?' he pulled out a gun and shot into Thomas's car.

This scenario supports the trial court's conclusion that defendant could be considered the initial aggressor. Therefore, the evidence supports the court's giving of CALCRIM No. 3471.

**CALCRIM No. 5.55**

During jury instruction discussions, defendant objected to both CALCRIM No. 3472 and CALJIC No. 5.55. However, defendant requested that if the court was going to use one, then the court should instruct with CALCRIM No. 3472, which includes the concept of provocation, and not CALJIC No. 5.55, which refers to seeking a quarrel.

As given, CALJIC No. 5.55 provides: "The right of self-defense or imperfect self-defense is not available to a person who seeks or provokes a quarrel with the intent to create a real or apparent necessity of exercising self-defense." On appeal, defendant argues there was no evidence from which a reasonable juror could conclude defendant was seeking or provoking a quarrel. However, as we have discussed previously, the record contains evidence that defendant sought and provoked an altercation with the occupants of the white Volvo. The court did not err instructing pursuant to CALJIC No. 5.55.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant contends defense counsel performed ineffectively in failing to request an instruction informing the jury that provocation may reduce murder from first to second degree. Sufficient evidence of provocation existed and defense counsel should have requested CALCRIM No. 522, which would have given the jury another less-generous choice than imperfect self-defense.

23

CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

"[Provocation does not apply to a prosecution under a theory of felony murder.]"

An instruction on provocation for second degree murder is a pinpoint instruction that must be given only on request and only if supported by substantial evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-880.) Here, defense counsel made no such request.

However, defendant argues there was abundant evidence supporting a provocation theory. According to defendant, "Any reasonable jury could have concluded that the driver did not have a gun, but given appellant's history of difficulty with a car he believed was the one that had been following him and shooting at him, the driver raising his/her hands in what could be perceived as an unfriendly manner that provoked appellant into such a state of fury that he grabbed his gun and shot at the driver."

To establish a claim of ineffective assistance of counsel, defendant must show counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and the deficient performance prejudiced defendant. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) We accord trial counsel's tactical decisions substantial deference and do not second-guess counsel's reasonable tactical decisions. (*People v. Maldonado* (2009) 172 Cal.App.4th 89, 97.)

We will not reverse on appeal if the record does not affirmatively show why counsel failed to act and the circumstances suggest counsel had a valid tactical reason for not acting. If the record sheds no light on why counsel proceeded in this manner, we

24

affirm unless there could be no satisfactory explanation for the act or omission. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Here, defense counsel throughout the trial relied on a theory of imperfect self-defense. The only evidence of provocation was defendant's uncorroborated statement that Thomas pointed a gun at him. Defense counsel did not argue that defendant was provoked into shooting Thomas. Instead, counsel argued defendant was followed and shot at by unknown assailants in the months before the shooting. To protect himself, defendant began carrying a gun. When Thomas drove by in the white car, defendant, believing he was again being threatened, followed the vehicle. Defendant wanted to end this nightmarish situation and believed he was in imminent danger when he thought Thomas was pointing a gun at him.

Given defense counsel's strategy and the evidence at trial, it was a reasonable tactical decision not to request an instruction on provocation. We find no ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.


        RAYE        , P. J.

We concur:


    ROBIE    , J.


    DUARTE    , J.